# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

WYNN RESORTS, LIMITED,

    Plaintiff,

v.

ATLANTIC-PACIFIC CAPITAL, INC.,

    Defendant.

Case No. 2:10-CV-00722-KJD-LRL

**ORDER**

    Presently before the Court is the Motion of Defendant ATLANTIC-PACIFIC CAPITAL, INC. (Defendant, APC) to Dissolve the Interim Stay of Arbitration Proceedings (#12). Plaintiff, WYNN RESORTS, LIMITED (Plaintiff, WYNN) filed an Opposition (#22), to which Defendant filed a Reply (#24). Also before the Court is Defendant's Motion to Compel Arbitration (#13). Plaintiff filed an Opposition (#23). Also before the Court is Defendant's Motion to Dismiss (#14) to which Plaintiff filed a Response in Opposition (#21). Also before the Court is Defendant's Emergency Motion to Vacate Ex Parte Injunction (#33). Plaintiff filed its Response (#34) to which Defendant filed its Reply (#35).

## FACTUAL BACKGROUND

    The instant action was removed by Defendant to this Court following Plaintiff's filing in state court of a Complaint for Damages and Declaratory Relief (#1). In connection therewith, Plaintiff

requested a stay of arbitration proceedings commenced by Defendant to which Defendant filed a response (#11).  The dispute centers around an Agreement dated March 30, 2009 between WYNN RESORTS, LIMITED and ATLANTIC-PACIFIC CAPITAL, INC. .[1]

Pursuant to the Agreement, WYNN engaged APC as exclusive global placement agent to raise equity capital for a formed or to-be-formed Special Purpose Vehicle (S.P.V.) sponsored by WYNN.  The agreement provides that the investment vehicle will be formed and capitalized on terms acceptable to WYNN for the purpose of acquiring, directly or indirectly, interests in gaming and hospitality assets or related securities.  The agreement further provides that WYNN shall have the sole right to determine whether to close on equity capital commitments arranged by APC .

Pursuant to the terms of the Agreement Section 1(a), it was agreed that:

APC will perform the following services in connection with solicitation of investments:
(i) assist in preparation of summary material describing the terms of the investments;
(ii) assist in the preparation of (A) a confidential offering memorandum and (B) other organizational documents;
(iii) assist in identifying, contacting and, at Wynn's request, negotiating with institutional high net worth and other suitable investors who may potentially invest in the investment vehicle;
(iv) provide all investors with the Memorandum;
(v) consult with Wynn as to strategy and tactics for initiating discussions and negotiations with investors;
(vi) arrange presentation meetings between investors and Wynn and participate in such meetings;
(vii) assist in closing of investments;
(viii) consult with Wynn as to general market conditions, including advising with respect to the minimum and maximum amounts of investments;
(ix) forward to Wynn any requests for additional information by investors and assist Wynn in responding to such requests; and
(x) provide such other services in connection with the private placement as may be mutually agreed upon by APC and Wynn.

The Agreement further provides in Section 1(b)that Wynn will not retain other sales agents with respect to soliciting of investors for the purpose of effectuating an investment or engage in conduct which circumvents the exclusivity and rights granted to APC.  The Agreement, Section

---

[1] A copy of the Agreement may be found at Docket #1-8, Notice of Removal, Wynn Resorts, Limted's Emergency Motion for Stay of Arbitration Proceedings, Declaration of Matt Maddox in Support of Motion to Stay Arbitration, Exhibit B.

1(h) requires APC to promptly notify Wynn as to the name of each prospective investor and the amount proposed to be invested by each such prospective investor and that Wynn shall have full discretion to decline to accept any investor proposed by APC.

Section 2 of the Agreement provides for a non-refundable retainer payable to APC in the amount of $100,000, upon execution of the Agreement. Section 2 further provides for a cash placement fee equal of 2% payable to APC on investments made by investors payable when the Investment Vehicle acquires, directly or indirectly, any interest or interests in gaming and hospitality assets or related securities, provided that no placement fee shall be payable with respect to investments made by APC or Wynn (or its subsidiaries, affiliates or directors). Section 2 also provides for a success fee to be paid APC in the form of a warrant convertible into one percent (1.0%) of the equity of the Investment Vehicle. Section 2 also provides for a fee of 1% payable to APC for a period of 12 months from the date of the agreement, if any investor introduced by APC but not known to Wynn prior to its introduction by APC, invests any amount in the next privately-offered Investment Vehicle sponsored by Wynn for the purpose of acquiring, directly or indirectly interests in gaming and hospitality assets or related securities if any (a "Subsequent Investment Vehicle").

Section 5(f) provides that the Agreement shall be governed by and construed in accordance with the laws of the State of New York. Section 5(g) provides that any dispute, controversy or claim arising from or relating to the Agreement shall be submitted to and determined by binding arbitration in Las Vegas, Nevada conducted by J.A.M.S., to be conducted pursuant to and in accordance with J.A.M.S.' Streamlined Arbitration Rules and Procedures.

Following execution of the Agreement, a draft document captioned "Wynn Acquisition SPV" was prepared and circulated (#16, Exhibit B). This so-called "Executive Summary" is dated April 2009. The cover page describes the Wynn Acquisition SPV as:

> A Special Purpose Vehicle formed to acquire from a distressed seller a highly valuable portfolio of Las Vegas gaming assets and subsequently enhance their financial performance through value-added management initiatives and operating expertise.

The cover page contains the logos of WYNN RESORTS and ATLANTIC-PACIFIC.

Subsequently, it is alleged by APC, a new WYNN RESORTS entity was created by WYNN to raise capital to acquire gaming and hospitality assets in Macau, China ("Wynn Macau"), this, in reference to the Wynn Macau Initial Public Offering (I.P.O.) of October 2009. APC alleges that the Wynn Macau I.P.O. constitutes "an Investment Vehicle" sponsored by WYNN RESORTS within the meaning of the Agreement. APC contends that WYNN breached the Agreement between the parties in failing to pay APC compensation in connection with that offering. On May 3, 2010, APC initiated arbitration proceedings requesting arbitration conducted pursuant to J.A.M.S.' Streamlined Rules and Arbitration and Procedures.

## ANALYSIS

The parties are in disagreement as to whether the Agreement of March 30, 2009, obligates WYNN to arbitrate APC's commission claims arising from the Wynn Macau IPO. WYNN claims that the Agreement covers only special purpose vehicles, such as the one proposed in the Executive Summary dated April 2009. WYNN alleges that the impetus for the Agreement were WYNN's interest in acquiring specific existing distressed gaming properties, and APC's advice that investors would not be comfortable committing significant sums to a "blind pool" vehicle where the actual projects were not known at the time of the investors commitments. WYNN also contends that the Agreement excludes WYNN's existing projects and entities, that fund-raising activities of WYNN entities, including subsidiaries and affiliates are also excluded and that APC would only have a right to compensation from funds deposited in the investment vehicle itself. WYNN further argues that because the parties never discussed formation of an investment vehicle for Wynn Macau, and no funding or even formation of an investment vehicle ever occurred for Wynn Macau, no commission would be due in any event.

APC counters that the Wynn Macau IPO was created as a method of circumventing APC's rights to a commission under the agreement. APC also contends that pursuant to the arbitration clause of the Agreement, the Arbitrator is to decide issues of arbitrability. WYNN responds that its

agreement to arbitrate under the J.A.M.S' streamlined rules related only the "special purpose vehicle" and even then was limited to disagreement regarding fee provisions and for an amount under $250,000, thus excluding all other disputes.

## APPLICABLE LAW

A dispute as to whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court, not the arbitrator, to decide. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002). Courts must defer "questions of arbitrability" to the arbitrator where the parties have "clearly and unmistakably" agreed that the arbitrator decide such issues. Howsam, 537 U.S. at 84. A broadly worded arbitration clause may show such agreement.

The Agreement, Section 5(g), provides that "any dispute, controversy or claim arising from or relating to this agreement shall be submitted to and determined by binding arbitration." The fact that this clause is contained in Section 5 and the fees and expenses clause is provided in Section 2, weighs against WYNN's argument that the arbitration clause was only to apply to fee disputes and not the entire agreement. However, it is undisputed that the agreement was primarily drafted by APC. WYNN contends it would never have agreed to arbitrate before a single arbitrator a claim against it for up to Thirty-Two Million Dollars, let alone arbitrate such a claim in accordance with Streamlined Arbitration Rules and Procedures.

The Federal Arbitration Act, 9 U.S.C. §4, requires the Court to be satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue before ordering the parties to proceed to arbitration. It is for the Court to decide whether the arbitration clause in the agreement of March 30, 2009, applies to the present controversy regarding a commission due APC in connection with the Wynn Macau IPO. U.S. Fire Ins. Co. v. National Gypsum Co., 101 F.3d 813, (2nd Cir. 1996) (cert. denied 521 U.S. 1120). Arbitrability hinges on whether there is an agreement to arbitrate and, if so, whether the dispute falls within the agreement.

ISSUES BEFORE THE COURT

I. Is there an agreement between the parties to arbitrate?

It is clear that the parties agreed to arbitrate certain claims that might arise between them in connection with the performance of the Agreement of March 30, 2009. The arbitration clause is not ambiguous as it pertains to the parties bound by the Agreement. The arbitration clause is contained within its own paragraph, separate from the compensation clause. This is not to say, however, that agreement clearly applies to the controversy between the parties over the Wynn Macau IPO.

II. Does the dispute over the Wynn Macau IPO fall within the agreement to arbitrate?

WYNN argues that Wynn Macau was a pre-existing entity specifically excepted from the terms of the agreement. Indeed, the Agreement in its first paragraph, refers to "a formed or to be formed special purpose vehicle." Use of the singular suggests that some specific investment was then being contemplated. The second sentence of the agreement describes the purpose of acquiring, directly or indirectly, interests in gaming and hospitality assets or related securities. The third sentence provides that "Wynn shall have the sole right to determine whether to close on equity capital commitments arranged by APC".

ANALYSIS

WYNN argues convincingly that the documentation for the WYNN Acquisition SPV prepared April 2009 demonstrates that the Agreement contemplated acquisition of existing distressed Las Vegas, Nevada properties. APC contends that the agreement is broadly worded and can be construed to include the Wynn Macau IPO. However, the lack of APC's participation in summary material or a confidential offering memorandum for the Wynn Macau IPO, and the absence of evidence of APC's performance of any of the other duties incumbent upon it pursuant to the Agreement is troubling.

The fact that Wynn Macau opened September 6, 2006 without any apparent participation from APC supports the conclusion that it was an existing WYNN entity, not one to be acquired by a Special Purpose Vehicle as contemplated by the Agreement. The lack of documentation showing

that APC notified WYNN of the name of each prospective investor in Wynn Macau and the amount proposed to be invested by each prospective investor as required by Section 1(h) is also troubling. The fact that WYNN has the full discretion to decline to accept any such investor proposed by APC, further weighs against the claim that the dispute is one which WYNN agreed to arbitrate.

      The exhibits submitted by APC in Volumes 1-5, do not support APC's contention that it considered Wynn Macau another Special Purpose Vehicle.  In fact, the only provision in the Agreement for a "subsequent investment vehicle" is contained at Section 2(d) which provides a commission for investors not known to WYNN prior to their introduction by APC who invest in a "subsequent investment vehicle".

      Absent from the record is any evidence that investors in the Wynn Macau IPO were introduced by APC pursuant to the Agreement.  Indeed, Exhibits 3-17 of APC's Exhibit Appendix contain only references to the SPV described in the April 2009 Executive Summary.  Specifically, Exhibit 3, consisting of Pages 1-7, captioned "Project Dixie", refers to properties A, B and C, consistent with the description contained in the Executive Summary for the three distressed properties to be acquired in connection with the WYNN Acquisition SPV Executive Summary of April 2009.  Exhibit 4, dated April 20, 2009, refers to "Named Properties" making it clear that the document relates to the distressed properties intended as the Wynn Acquisition S.P.V.  Exhibit 5, dated April 23, 2009,  refers to investors A, B and C under the subject line "Project Dixie".  Exhibit 5, dated April 27, 2009, is also related to "Project Dixie".  Thus, it is clear that "Project Dixie" and Exhibits 3-7 relate to APC's responsibilities in connection with the Agreement and the Wynn Acquisition SPV.  Exhibit 8 is a Proposed Operating Agreement of WYNN Recovery Partners showing a proposed investment by Investor A of $100,000.  Exhibit 8 is dated August 21, 2009 and appears to be a follow-up discussion to formation of WYNN Recovery Partners to be formed for the purposes of identifying investment opportunities in the discounted or distressed debt of gaming and hospitality companies.  Exhibit Appendix 11 is a Cayman Islands search report showing formation of Wynn Macau, Ltd. on September 4, 2009.  The remainder of APC's exhibits consist almost entirely

of the Wynn Macau Global Offering and reporting forms, which do not reflect any involvement by APC in the Wynn Macau IPO.

It is apparent from the exhibits that the parties, pursuant to the terms of the Agreement, were discussing a single venture, the Wynn Acquisition SPV, to acquire specific distressed gaming properties. The Wynn-A Recovery Partners (Exhibit Appendix #8) was a proposed Nevada limited liability company, to be formed for the purpose of identifying and acquiring distressed loan or debt securities or targeted gaming and hospitality companies with the intention of ultimately gaining control of the targeted company. Thus, the proposed entity, Wynn-A Recovery Partners, LLC, would become the entity for acquiring the three distressed gaming properties contemplated in the Wynn Acquisition SPV and the Agreement.

The absence of evidence of any involvement by APC in any other Wynn Special Purpose Vehicle further supports the conclusion that the parties never intended that a listing of shares by an existing or even newly formed and indirect subsidiary of WYNN RESORTS would obligate WYNN to pay a commission to APC. The congratulatory e-mail of November 20, 2009 from James Manley, Chairman of APC to Matt Maddox of WYNN (#16-3) supports the conclusion that the commission claim is an afterthought. In that correspondence Mr. Manley offers his congratulation on the public offering in Macau:

> It's really a tremendous vote of confidence in **your** (emphasis added) organization. We understand that your receipt of money from the offering means you are not going forward, at least for now, with **the other funds** (emphasis added) we had raised for you. But we should get together and talk about what to say to our investors and how to keep them warm. After all, you never know what deals may come your way and it's certainly a shame to let go of what was over $3B in circles.

Nowhere is there a suggestion of involvement by APC in raising funds for the Wynn Macau IPO, or a commission claim, only an acknowledgment that WYNN would not now need the funds for the SPV and acquisition of the distressed properties previously identified.

The Wynn Macau IPO Global Offering documentation (#24, Exhibit Appendix, Ex. #12) submitted by Defendant APC with its Reply (#24), raises issues not addressed by the parties. Wynn

Resorts Macau (WRM), Wynn Macau, Limited and Wynn Resorts, Limited are separate entities. "Our company is currently an indirect subsidiary of Wynn Resorts, Limited." (#24, Ex. 12, page 105). After the IPO, Wynn Macau, Limited (Cayman Islands) would continue as a separate company entirely dependent on the income from a single property, Wynn Macau (#24 Exhibit 12, p. 5). Also, WRM is required to have an executive director who is a Macau permanent resident and holds at least 10% of the voting shares and capital in WRM. The corporate structure following the IPO reflects the interests of Mr. Wong Chi Sen in that capacity. (#24, Ex. 12, p 75). The IPO disclosures include the fees and commissions payable from proceeds (#24, Ex. 12, p 10). The Offering does not disclose any fees or commissions payable to APC. It is not contended that either WRM or Wynn Macau Limited are party to the Agreement. While a non-signatory may be compelled to arbitrate if it is so dominated that it is appropriate to pierce the signatory's corporate veil, there is no evidence before the Court to compel arbitration under a veil piercing argument. Fisser v. Int'l Bank, 282 F.2d 231, 234-35 (2nd Cir. 1960).

APC's contention that it is entitled to a commission from the Wynn Macau, IPO also implicates the rights of Wong Chi Seng and other shareholders and purchasers of the IPO who were not informed through the offering literature and disclosures that such would be the case. Separate identities of parent corporation and its subsidiary, even wholly owned subsidiary, should not be disregarded unless recognition of their separateness, under the circumstances would sanction a fraud or promote injustice. Royal Indust. v. St. Regis Paper Co., 420 F.2d 449, 453 (9th Cir. 1969); see also, Rep. of Nicar. v. Standard Fruit Co., 937 F.2d 469, 480 (9th Cir. 1991)(question of whether a subsidiary of a corporation which signed a "Memorandum of Intent" is bound by an arbitration clause is for the court rather than arbitrator).

## CONCLUSION

The Wynn Macau IPO was a stock sale by an independent subsidiary, not an "acquisition" by Plaintiff WYNN RESORTS, LIMITED. The Agreement of WYNN RESORTS LIMITED to arbitrate certain disputes arising from the Agreement dated March 30, 2009, cannot be construed to

entitle APC to a commission for the Wynn Macau IPO.  The Agreement specifically excludes investments made by WYNN or its subsidiaries, affiliates, officers and directors.  It is undisputed that APC had nothing to do with the Wynn Macau Ltd. and that neither the company nor its investors are parties to the Agreement.  Wynn Macau, Ltd., IPO and its shareholders would be potentially harmed by any arbitration decision imposing liability for a commission.  The Agreement and its arbitration clause have not been shown to "clearly apply" to the Wynn Macau IPO.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Dissolve Interim Stay of Arbitration Proceedings (#12) is **DENIED**;

IT IS FURTHER ORDERED that Defendant's Motion to Compel Arbitration (#13) is **DENIED**;

IT IS FURTHER ORDERED that Defendant's Motion to Vacate Ex Parte Injunction (#33) is **DENIED**;

IT IS FURTHER ORDERED that Defendant's Motion to Dismiss (#14) is **DENIED**.

DATED this 25th day of March 2011.

_____
Kent J. Dawson
United States District Judge